Mr. Duncan, when you're ready. Thank you, Your Honor. Good afternoon. May it please the Court. Dana Duncan on behalf of Vance Caulkins. This matter comes before the Court on a claim for disability benefits. Mr. Caulkins suffered a hernia while in the United States Coast Guard. That hernia reoccurred later. He has resulted from having nerve damage and nerve pain advancing into the abdomen and groin area as a result of this. He received a 100% disability rating from the Veterans Administration with a finding of 100% disabled for employment purposes. The date last insured in this case is December 31, 2014. Therefore, if the denial of benefits in this case would prevent him from obtaining or securing disability insurance benefits unless he reestablished insured status. Mr. Duncan, let me ask you this question because it helps me kind of get to where I think the case goes. What is the standard of review for this Court? The standard of review is substantial evidence review. The problem... Let me follow up on that. Suppose hypothetically, and we speak in hypotheticals a lot of times because it helps us work through the analytical framework. Suppose this had been a case that was one that would go to a jury. Right. And suppose that during the course of that case, you had two experts. And that's what we see all the time in cases that go to trial. It's battle of the experts. Which one the fact finder believes? And the fact finder in that case had found against you. Obviously, the standard of review would be probably deferral to the determination. Correct. Seems like the standard is even more difficult for you here because what we again have is battle of the experts. One expert supports your client's point of view. The other expert does not. And with our limited review authority, why isn't that determinative of how the case should be resolved? Because of two reasons, Your Honor. Yes. First, the doctors in this case that provided opinions were treating source. The treating source rule still applied at the time this case went forward, which this Court has held as recently as last year. And in another case that was actually briefed about this and argued about the same time, but the decision was not made until early last year, Arrakis, which indicates that the treating source statement is given authority and can only be overcome if there's contrary or substantial contrary evidence. In this case, the substantial contrary evidence that the ALJ points to is the non-examining medical opinions. We have a state agency doctor, one of whom was a general practitioner, and the other, I'm drawing a blank off the top, but neither had any real significant experience in dealing with neurology or orthopedics. And then on the other side, she indicated two points, or the judge did, two points. One was his wide-ranging daily activities and his lack of treatment. Social Security rules, their rules, their own rulings, their requirements state what the judge is supposed to do. If they can't even follow the rules that they establish, then there's a problem, and this Court should remand. In this particular case, the judge went and said failure to treat. There are two specific Social Security rulings that indicate a judge must make inquiry and evaluate why the treatment was not followed. For example, in SSR 16-3P, it specifically indicates that if the claimant has significant side effects regarding medications, he does not necessarily have to take those medications. In this particular case, Mr. Calkins had significant medical symptoms and side effects from his condition worse. He also said something to the effect that he didn't take the medication because he didn't like pills? Correct. And I understand this Court has not, but sister courts have held that that's part of the issue of mental illness, which is when you have mental illness, it's not something necessarily you like to admit and you try to avoid it. It is unfortunate, but that is a reality of the situation, and I think to some extent that was what was going on here. When his condition got to the point where he was suicidal, he started taking the pills again for a while and seemed to stabilize, but still the problem is there was never any real inquiry, and there's nothing in the decision that outlines any of this. The second thing is the daily activities. This Court has repeatedly said, in precedent, that the ALJ has to evaluate those daily activities to see whether or not they're consistent with the ability to work. And if you are not, or you can only hold that against them if they do not, or if they are unrelated to work. For example, if... But this record suggests that he was able to vacation in Hawaii. He was able to take care of his sons. He was able to do, I guess a good way of explaining or identifying is that things that he enjoyed doing, he liked to do, but other things he didn't so much like to do. Well, as far as taking care of his children, I'll just quote Judge Posner from the Seventh Circuit who said, what option did he have? Is he supposed to put them into social services? Just because you suffer from a disability does not mean that you have to stop living. It is not, as the Ninth Circuit said, place you in a condition where you live your life sitting in front of a TV, unable to function. The question is, is whether he can or cannot perform work on a sustained daily ability. If he only is limited, say he can work for six hours a day, he's still disabled under the law because you have to be able to work 40 hours a week, eight hours a day. That's the definition of sustained work activity. And in this particular case, that never happened. Moreover, so that's part of it. And then the other part of it is, it always comes down to substantial evidence review somehow or another has become some sort of catch-all that means a completely differential view of anything and everything and all aspects of this. And it's not. It's all about the level of articulation. That's what the Supreme Court established. That's the way the laws were written back in the 30s when this was established and created. And in this particular case, we have wide gaps of stuff that were never addressed, never discussed, and which do not support the conclusions. So I would point out that the problem also comes in here, that the judge just in looking at the VA decision, we're not talking necessarily that the ALJ was required to adopt their findings or their conclusions, but the judge cannot just simply go, I've considered it and ignore their detailed assessments. I mean, they went through and did a compensation, or a compensation and pension examination with some very great detail and went on for- Can you point me in the record to the, I don't understand the record. So I'm at JA-202, which I understand is the individual unemployability decision by the VA. Yes. And when I look at it, there are lots of words, but I only see the analysis is the evidence shows that you're unable to be sustainably employed. I mean, that's the analysis, right? I mean, there are lots of words here, but that's the extent of the analysis, right? And so, which is fine, but you say they did a detailed analysis. And so in the VA, what am I missing? Am I not looking at the right document? I'll refer you to Dr. Morton's compensation and pension examination. Our 407 was done on April 27th of 2012, which was referenced and noted, and which was ultimately incorporated into that decision itself. But it's not incorporated into the analysis, right? So that's the rub I'm having is when I read the analysis of the VA, which it's totally entitled to, right? It doesn't have to do anything more than it wants to. But it just said, it gives the conclusion, right? I mean, it states a lot of standards, right? And goes through and it talks about the evidence that was presented. But when it gets to the analysis, it only gives the bottom line. Yes. Unfortunately, I did not create the record. No, no. But you said they gave detailed analysis, right? And so what I'm looking at here doesn't seem so detailed. What I'm referring to as detailed is the compensation, pension examinations, and other things in the record, which were used when they wrote that decision. In other words, the foundation of that is in the record and has to be evaluated, and it was not. Do our cases say that the record of the VA decision is entitled to deference or that the VA's decision is entitled to deference? It's the decision of the VA, not the record in the VA case. It's the decision. We're deferring to that decision maker. Yes. But in order to defer to the decision, you have to have some idea of what the basis is, which means you evaluate medical opinions that made up that. Unfortunately, there were probably five to eight pages that did a detailed assessment that were not in the record because that is just the decision. The actual support for the decision was not in there. So I don't know what happened to that. But you would go to and look at Dr. Morton's evaluation. So if there are no other questions, I guess I'll reserve any time I have left for rebuttal. Thank you, Mr. Duncan. Ms. McWilliams. Thank you, Your Honor. Good afternoon, and may it please the Court. Lenita McWilliams on the behalf of the Acting Commissioner of Social Security. The claimant was in his 30s at the time of the ALJ's decision, and at that time, the ALJ found that his hernia repair, his nerve resection, and his related complications were severe. To account for the claimant's disability, he restricted him to sedentary work, which is the lowest level of exertional work that a person can perform in the competitive workforce. The ALJ only found that the claimant was not disabled based on his ability to perform unskilled sedentary work as directed by Social Security's Red Rules. The claimant's core disagreement with the ALJ's decision is centered on the Department of Veteran Affairs disability ratings in the record, and the VA based this rating primarily on the claimant's mental impairments, although the VA explained at page 1050 of the record that the claimant's rating was not permanent due to the likelihood that his mental symptoms would improve. So I'll start by briefly addressing how the ALJ considered the VA rating, and then afterwards, I will discuss the ALJ's evidentiary analysis, which supported his findings. At page 851 of the record, the ALJ summarized two persuasive, specific, invalid reasons for giving the VA's rating less weight after carefully reviewing the evidence. One, he stated that the clinical evidence was a reason, and this clinical evidence included records that the VA did not have before it when it was making its most recent decision in October 2013. And second, the ALJ stated that he looked at the claimant's array of daily activities. The ALJ offered supporting details at his step two analysis, which begins at page 838 of the record, and his RFC assessment, which begins at page 845 of the record. As this court stated in McCartney v. Apfel, the ALJ only needs to review the medical evidence once in his decision, and as this court stated in Keene v. Berryhill, the court considers the ALJ's decision as a whole. It is the clinical evidence in daily activities that the ALJ describes in this detailed analysis at pages 838 through 851 of the record that informs his rationale in making his decision, which I will... That's basically it, isn't it? And when it comes to mental impairment, it's only just the position against these daily activities, because there's nothing on the other side in terms of the commission that's contrary in terms of psychological evidence, is there? I'm sorry, Your Honor. Is there any psychological expertise that says he does not have these problems on that side? On... Don't you rely solely upon saying, because he can do these things, then this... I'll give little weight to this psychological evidence. But you don't have on the other side psychological evidence saying that that's wrong. You're taking... Is that correct? I just want to give you the framework. Isn't that your argument? Because he can do these things, you can tick him off, children, go to Spain, and even contemplate going to Mexico and doing things like that, washing clothes and shopping, right? That laundry list of activities is what you're saying that militates against psychological evidence from the VA, right? Yes, and that's... And that's it, correct? That's not all, Your Honor. But tell me what else do you have on your side that these psychological findings, clinical, diagnostic, or prognostic, or otherwise, that's on the other side of that? Okay. And so, yes, the ALJ, he considered the activities of daily livings as a portion, and he considered it in context with the full clinical picture. At 830... At 838 through 845 of the record, the ALJ gave over six pages of detailed analysis to explain his findings. And in that portion... I think you must have misunderstood my question. What expertise do you have that psychological evidence from an expert that says they are in psychology is wrong? Well, so the ALJ pointed to reports from Dr. Morton, who is a consultative examiner, that the agency sent the claimant to. And Dr. Morton said that the claimant appeared to cope with irritability well. He could cooperate with authority figures. And Dr. Morton also said that the claimant clearly had the ability to understand, retain, and follow instructions. And so, from this examination, which was based on a one-time review of the claimant, and as well as Dr. Morton's review of the records that he had made available, the ALJ considered those findings from the record. But didn't Dr. Morton say he had a mental impairment, too? Dr. Morton did say that the claimant had a mental impairment, and the ALJ also found... Everybody did who had the expertise, only the ALJ... Everyone who had expertise said yes, but the ALJ, you said, said otherwise. No, the ALJ did not deny that the claimant had a mental impairment. The ALJ just found that the claimant's mental impairment was not severe enough to affect his ability to perform unskilled work activity. The problem is, though, work environment and home environment are totally different. There are people, for example, who have documented DSM-3 diagnosis, schizophrenia, whatever. They can operate at high levels, but if you put them in a work environment where it has to be structured, and attention, and somebody said, did you get that right? It could be disastrous for them. So you're saying because that person who, for example, has a DSM-3 finding can have comfort with their children, go shopping and do those things, and operate at... That means that, oh, because you can do that, we could put you in a working environment and you clearly... Do you have anybody, any expert that says that on your side? No, and that's not what the ALJ is relying on. He's not just simply relying on the claimant's ability to perform these activities. He's looking at the claimant's activities in the context of the entire clinical picture. So the ALJ, he examined the claimant's treatment history. And for example, he noted... He looked at it, he looked at it. Yes, he looked at it. And he noted at pages 841 and 843 of the record that he first treated with Dr. Connolly in January 2013, and that she had only treated him seven times within a 14-month period. And while the claimant was treating with Dr. Connolly, he reported that he was doing better. He was no longer depressed and just sad. And she prescribed him a low-dose antidepressant to deal with these residual symptoms that he was reporting, but he refused to take them. And at page 842 of the record, the ALJ explained that the claimant continued to be noncompliant with medication because he did not believe in taking pills, although he found the medication helpful. And he would start and stop his medication at will when he thought it was necessary. Do you realize that denial of medication is a big problem with many people who have psychological problems? Yes, and that is very well true, Your Honor. But in this case... Does that mean they don't have them? For example, a person who's bipolar, for example. It is important that you keep your chemistry and your blood very well regulated. One of the biggest problems is getting them to self-medicate properly. But that doesn't mean they're not ill. That's correct. But that's a part of the symptoms of their illness. It's like telling somebody who's manic-depressive, just cheer up. But if they could cheer up, they wouldn't be manic-depressive. So the reason, part of the reason, why they don't take their medicine is the same reason that they're ill. It's circular. It's not linear. I mean, because that whole problem, when the courts come in, they write opinions. And we ignore science all the time. I mean, we write these opinions. You know, the ALJ, it's not, it's circular. That's the whole problem. People who are addicted to all kinds of things in terms of drugs, why don't you just stay away from it? That's one of the problems. They can't. And that's why they need help. But if you're saying that this is because they can do this, that's what I want to make sure. Because they can do these activities, because they did not have a good regimen of taking their drugs, because the psychologist didn't over-treat and try to get him to have coping skills rather than having multiple visitations, because that's what you're saying. Oh, you only saw him seven times. That may be good medicine, because that helps get coping skills. Because at the end of the day, you have to live with yourself and be able to discipline your medication and cope. But you're taking all of these things against them without any science or anything on the other side to your position. Well, the one thing, to Your Honor's point, the one thing I want to point out is that the ALJ did not disregard the claimant's treatment in that respect. He actually found that despite this sporadic compliance, which is the words that he used, that the claimant still demonstrated overall improvement in his mental health as shown by his stable mental status examination findings. In the record, you had, there were occasions where he had mood difficulties and his effect was restricted. But there are also many other status examination findings that shows that his mood was dysphoric and he was completely stable. So the ALJ is taking on a balancing act when considering both the positive and negative findings. And based off of taking all of these factors together, the claimant's ability to go on trips, to extensively research his impairments, to just take control over his life in a way, despite how he's feeling, and also his desire just to not treat things, treat his mental impairments with medication that he agreed does help, the ALJ drew the reasonable inference that his symptoms must not be as severe, which is appropriate based on the facts in this record, although it might not always be the case. Counsel, do you agree or disagree that this case is substantially resolved by the standard review of this court? I would agree with that, Your Honor. What if we had a situation though with taking into consideration the appropriate standard review, if we had an incomplete record, if we make the determination, not that the district court was wrong or the ALJ was wrong, but rather we have an incomplete record to make that determination, would your answer be different? Depending on the facts of the case, my answer very well may be different. For example, if the claimant produced something that was not introduced into the record that would materially alter the ALJ's decision, then in that case, yes, it could change the outcome, but we don't have that here at this point in time. Can I ask a record question? Yes. Sorry, you've been great with Jay's sites. I've been scribbling them down. I certainly appreciate them. Is there anything in the record that suggests that the nature of the claimant's mental illness inhibited his ability to make a voluntary choice to take medications or not? I mean, I certainly take the Chief's point. In some instances, that's true, but is there anything in this record that suggests the nature of his particular mental illness? I mean, did the doctor find that he was, you know, unable to make a voluntary choice about medications or not? No, there's nothing in the record to that effect, Your Honor. And actually, the ALJ pointed to one of the VA doctors. I believe it was a Dr. Aaron, and his reference can be found on page 1093. And surprisingly, this doctor, this VA doctor who was looking at his mental impairment said that his mental impairments did not deem him unemployable, even though the VA found otherwise. And so it's this, when the ALJ is faced with all this conflicting evidence, it's his job to resolve those conflicts and evidence. And that's what the ALJ did here. And his decision outlines his rationale. It outlines the various pieces of evidence that he's reviewing and that he's taking into account. And his evaluation is afforded significant deference. Do you know what, of course, you know what his disorder is, don't you? Yes, Your Honor. What is it? He has depressive disorder. It was characterized many ways in the record. Some clinicians said adjustment disorder, but depressive disorder. When you have depressive disorder, what, in terms of spectrum, what spectrum in terms of human thought and everything that that covers? Because Judge Richardson asked you a very important question. He said, is there anything in the record that would suggest anything about his disorder that would impact the ability to take medicine? When you have depressive disorder, doesn't that cover the whole spectrum of your thinking? It primarily deals with your mood and your motivation. But... Like that some days in the morning, you can't get out of the bed. That's correct. That would be your whole day, wouldn't it? That's correct, Your Honor. But depending on the severity, the degree of depression, the claimant has. And in this case, the ALJ found that the claimant's depression was not on the extremely severe spectrum where he would be able to get out of bed. Rather, it was on the other side of the spectrum where, yes, he has some difficulties. He's struggling with some things and coping, trying to get coping skills to manage these different areas of his life. But the record does not show that his depression is so debilitating to the point where he cannot manage his treatment. He cannot comply with treatment and he cannot get out of bed or he cannot perform unskilled sedentary work. And I think that's the point that the ALJ is making. You know, we're dealing with people who are veterans coming from the wars, Gulf Wars, with post-traumatic stress disorders. They look healthy as a... Fit as a drum. Fit as a fiddle, if you will. But incredible debilitating problem. And there's... We get like that. Depressive disorder. What does that mean? And then, well, but you look healthy. I see you taking your kids to the theater. You go to a park. But the trauma they dealt with in terms of in the Gulf Wars and what they saw in those things impact. It's incredible impact. And just to say, well, you know, you look well. You're fine. You just have this depressive disorder. That doesn't impact your ability to work. And it'd be different if this was a case where you had a malingering scale, which you could have done. There's no evidence in this record that he's a malingerer, is there? Not to my knowledge. Right. And there is a malingering scale that you could have put him through, couldn't you? Yes, Your Honor. That's right. But then you come and say, well, it's just depression. Depression covers everything. I'm out of time there. You know, but I'm the chief. So I'm asking you the question. You're always in good stead. Okay. Thank you, Your Honor. The ALJ was required to evaluate the evidence that he had before him. And based on this complete record, he was able to make a determination. And he decided that, based off of the clinical picture that was before him, showing the claimant's improvement with treatment and without treatment, the claimant's stability, that his mental impairment was not severe. He did not deny that the claimant experienced some symptoms or some difficulties. He just said that under Social Security's rules, that it did not prevent him from performing unskilled work. Thank you, Your Honor. I will rest in the brief. Thank you, Ms. McWilliams. Mr. Duncan, you have some time reserved. All right. Thank you. Let's, I just want to make one point. He was limited to sedentary work. The fact that there were absolutely no restrictions placed on him for mental impairment was significant because almost all sedentary work involves working with people. And the VA just said, and the deference that's owed to that, the VA on page JA 1049 and 1050 noted that he had near continuous panic affecting his ability to function independently. Difficulty adapting to stressful situations. Inability to establish and maintain effective relationships. Can I just, I just want to make sure I understand what the record we're looking at. I was trying to pull up 1049 to see what it is. Is that the VA examiner's decision or is that just evidence that was before the VA decision? The actual VA decision says the 19 or the 2013 decision specifically noted and stated we have assessed a 70% evaluation for your depressive disorder based upon and then outlines all of these. And we're talking in here. And that's it. And that's it, 1049. So when you're quoting there, you're quoting from the 2013 decision. Correct. So we have an individual who has difficulty working with others. And now we're going to put him in a sedentary position. And at the same time, while the standard of review is the substantial evidence standard review, the law is that there has to be articulation. The judge never discusses in the entire decision that there should be a consideration of controlling weight for Dr. Connolly or Dr. Kelly. Both were seven times. So she only treated him seven times, Dr. Kelly or Dr. Connolly did. That's a lot, really, for a medical opinion. I mean, the state agency doctors made an opinion. They found mental impairments. They never examined him. But we have no problem relying on that. In this particular case, there is so much in this as far as the two medical opinions by themselves, just focusing on those two medical opinions. And the fact that all of the other medical opinions are consistent with each other. The state agency found mental impairments and said there was limitations. The Dr. Morton set up. Can I go back? I just want to make sure I understand the VA. So the 2013, which was not the unemployability decision, but instead just focus on the increase from 50 to 70 percent, includes the conclusion that the evidence does not show total occupational impairment. So in other words, they conclude there that based on the mental side, he is able to work, right? I mean, that's the conclusion. Now, that's inconsistent with the 2011 decision. But what they say is that it's not disabling because you don't show total occupational impairment. The standard itself is different for the VA than it is for Social Security. Ultimately, the fact that they made these specific mental impairments together with what the ALJ found to be sedentary. I've been in the. You're asking us to your chair. I just want to make sure I'm understanding. It's just cherry picking. You're saying look at the things they said. Look at those, but ignore the conclusion from the VA that he does not show total occupational impairment. So in other words, he's employable after they describe all these things. So if I'm reading that fairly, what I say is the VA has found you have these impairments, but they are not of such that it would prevent you from working. And that's correct. The standard, though, for determining what is and is not unemployability is a different standard than Social Security, because I get that. And that's an important point. They are different standards, right? And we might think about that and whether you have to rely on the VA's decision. But my point is the VA is finding the impairments you want us to talk about and then finding that he does not have total occupational impairment, right? Whatever their standard is that they're making that decision. And I guess what I'm saying is shouldn't we rely on that just as much as we rely on the 2011 ALJ or 2011 VA decision? I understand your point. But what you have to really focus on is the specific findings that I outlined, because the VA did not limit him to sedentary work. The VA gave him a rating on his physical impairment. The fact that he is sedentary in the residual functional capacity with all of these additional mental impairments would come in. If you would put limitations on his ability to function in a work setting with any one of these, you could pick three out of that whole list from JA 1049 and 1050. And I will virtually guarantee a vocational expert will say there is no work at the sedentary occupation. But the problem I've got, and I just want to give you one chance to sort of help me get my head around this, is I understand that's your opinion and you can guarantee what a vocational expert will say, and that's great, right? But that's not helpful to me, right? Because, you know, I've got evidence on both sides. I've got some VA examiner that says I've looked at his mental state and that doesn't render him a different standard, but same basic idea, totally occupationally impaired, right? And you got other people going the other way, right? And so the challenge that I've got and what it sort of goes back to Judge Alston's point is there are a lot of these things. And yes, there are people on both sides of the Dr. Aaron's one way, Morton's the other way, the VA examiner in 2011 is in your favor and 13 sort of is against you. And the ALJ makes a sort of judgment about that. And I'm sort of stuck with seeing how I can reevaluate that. The fact simply is that he gave absolutely no limitations for mental impairments, despite the evidence here. And he did it only on his own opinion. The state agency doctors found mental impairments. Dr. Morton found mental impairments. Dr. Conley found mental impairments. The only person who did not feel that his mental impairments were sufficient to cause some level of limitation was the ALJ. And if that's not the definition of playing doctor, I don't know what is because he doesn't even have anything other than he doesn't even point to specific medical findings necessarily. He points to daily activities and he points to his lack of treatment. And the brief outlined how both fail. Both of my briefs did. And not to mention the fact is that we also have Dr. Kelly's opinion, which we have the same problem with. He said he was going to need to have unscheduled breaks. He was going to be absent more than three days a month. All of those would also support a finding of disability. And the judge doesn't really go through. He just again says, I don't find them supported by the record because of his daily activities and his lack of treatment. That's all we have. If we could go circular back to the very first question that I asked, and I don't think it's necessarily dispositive, but I like the question. I thought it was a pretty good one. Is that as long as we can look at this record and evaluate from the point of view that we have to as judges sitting on an appellate court and whether I disagree with what the ALJ found, and I will tell you this, it's a tough record as far as disagreeing with the ALJ. The ALJ is not really what I think I would have come up with if I had been sitting as the ALJ in that court, or in that case. But in this case, because the standard is more than a mere scintilla of evidence, which takes us back as long as there's something in the record to support the finding of the ALJ in the district court, we're stuck. No, Your Honor. And the reason is, is because it's still an articulation standard. The judge has to put down in writing within the four corners the basis of his decision, and it has to be substantial and clear and something that, you know, the Seventh Circuit uses build a logical bridge as their catch-all phrase. Sounds like Judge Posner. Yes, Judge Posner. And Judge Duncan in this court wrote the case where Patterson, where it says they have to show their work. That's the problem, is that the work is not being shown sufficiently in this case. If we didn't hold them to that standard of articulation, all the ALJ would have to do is go case denied, see attached, and print out the record. I think that Counsel, as Judge Richardson always does in his very, very wonderful acumen in terms of honing in. It's a good point, but I think it's right there. The answer is that what the VA is saying is, no, he is, there is something that he can do, but that is not enough to justify these, the RCF that they came up with, because you still got to run the gauntlet, as you say, with all of the mental impairments that he has to find the job. So, yes, there may be a job, but you can't do it by saying, okay, you can be a ticket, you know, you can take, you can be a cashier, you can do that, because they have much, but when you put that alongside the dysfunctional in terms of dealing with people, there's still a problem. You have to find a job where he doesn't have to deal with people and run that gauntlet, and yes, there is something out there, but you can't do it by ignoring, he can do something now, let's give him that normal, I see it all the time. Out there, there's a ticket, you can take, there's a lot of ticket takers, I don't know what they're taking tickets for, but anyway, they take tickets, and they're cashiers, and they're working and stuff like that, but all of them deal with people, so you can't ignore that line and say, oh, you can do something, yeah, then they need, there's nothing on the other side, they said he could do something if you consider these impairments, that's why, so we don't have to defer to that, even with a lower burden of substantial evidence, in my view. The numbers have to be a substantial number of jobs in the national economy. Exactly. If there are no other questions, I guess I've spoken enough. All right. Mr. Duncan and Ms. McWilliams, thank you so much for your arguments, you have helped us very well in all these difficult cases, and we appreciate your arguments, we can't come down and shake your hands, but know that nonetheless, we appreciate it so much, and we wish you well, and be safe, and thank you so much. And with that, I'll ask the clerk of the court to adjourn this session in the morning session of the court. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Roger L. Gregory, Julius N. Richardson, Rossie David Alston Jr.